IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MARTHA LIDIA ZUNIGA | § | CASE NO. 05-33416-H4-7 |
| | § | |
| DEBTOR | § | |
| | § | |

MEMORANDUM OPINION ON CHAPTER 7 TRUSTEE'S
MOTION TO SHOW CAUSE AND UNITED STATES TRUSTEE'S REQUEST
FOR ENTRY OF ORDER DISGORGING FEES AND OTHER SANCTIONS

## I. INTRODUCTION

In July 2004, Martha Lidia Zuniga, the debtor in this Chapter 7 case (the Debtor), was experiencing difficulty meeting her credit card, mortgage, and home equity loan obligations. The Debtor responded to an advertisement by Select Financial Solutions (Select) offering "credit repair" services and was persuaded to pay Select $1,199.00 to assist her in filing a bankruptcy petition. After accepting the Debtor's fee, Select referred the Debtor to the Bernal Law Group (BLG), a California law firm located in the same building as Select. Because BLG was not licensed to practice law in Texas, BLG hired Dion Craig (Craig), an attorney in Houston, as local counsel to assist the Debtor in filing her Chapter 7 petition, Schedules, and Statement of Financial Affairs (SOFA). Craig filed these documents with this Court on March 7, 2005.

On April 22, 2005, Randy W. Williams, the Chapter 7 Trustee (the Trustee) for this case, filed a Motion to Show Cause requesting this Court to inquire whether the relationship among Select, BLG, and Craig: (1) involves unauthorized fee splitting; (2) fails to adequately disclose the true nature of the representation of the Debtor; and (3) involves the unauthorized practice of law. On July 20, 2005, the United States Trustee (U.S. Trustee) filed a response requesting this Court to order Select, BLG, and Craig to

disgorge all fees received from the Debtor, pay all costs incurred by the Trustee for the investigation of this matter, and pay any other sanctions this Court may deem appropriate. The purpose of this Memorandum Opinion is to address these issues and others relating to them.

## II. FINDINGS OF FACT

The facts, either as stipulated to or admitted by counsel of record, or as adduced from the testimony of the witnesses and introduction of exhibits, in chronological order, are as follows:

1. The Debtor works as a janitor for the Aldine School District where she earns $8.50 per hour. Her native language is Spanish. She speaks and understands very little English. [2004 examination at 4, *In re Zuniga*, No. 05-33416-H4-7 (S.D. Tex. July 13, 2005).] Indeed, at the hearing on the motion to show cause, an interpreter had to be present to assist the Debtor in giving testimony.

2. The Debtor was married on June 1, 2004. Prior to her current marriage, the Debtor lived with a man for eighteen years to whom she was never formally married. [2004 examination at 16.] Together, the couple purchased the Debtor's current residence at 182 Glaze Brook Drive, Houston, Texas. [*Id*. at 17.] The Debtor testified that when this gentleman moved out, he relinquished his interest in the residence through a letter from an attorney; however, his name remains on the deed. [*Id*. at 19.]

3. In July 2004, overwhelmed by credit card debt and struggling to make payments on her home equity loan and mortgage, the Debtor responded to a Spanish television advertisement by Select, aired on Hispanic television stations in the Houston area, which offered referrals to debt-relief education programs. The Debtor called the telephone number provided by the commercial, and was introduced to Select's offices in California. [2004 examination at 6.]

4. After running a credit report and determining that the Debtor was not eligible for any of its programs, Select then recommended that the Debtor file for bankruptcy and solicited payment towards this end. [2004 examination at 7.] The Debtor

provided Select with a voided check, and between August 2, 2004 and September 7, 2004, Select made four direct deductions from the Debtor's checking account totaling $1,199.00. [*Id.* at 8]; [Trustee Ex. 1.]

5. Select sent the Debtor a packet[1], dated August 2, 2004, that "welcomed" her to its program. Additionally, the letter stated that Select was "confirming and verifying" the Debtor's "inscription" to its program. [Select packet, Trustee Ex. 2.] The packet contained a pamphlet entitled "A New Opportunity, Bankruptcy," as well as a copy of the worksheet Select's employees filled out when the Debtor originally called Select. [*Id.*] The worksheet stated that the Debtor verbally agreed to Select's contract and was signed by Select's employees. [*Id.*] Additionally, at the top of the worksheet, an employee of Select checked "Bankruptcy" and wrote "#7" in the margin. [*Id.*] A "notice of cancellation" is printed on the back of the worksheet and it states that clients may cancel the contract within the first three days after they enter the program. [*Id.*]

6. Only upon receipt of the full $1,199.00 did Select inform the Debtor that her case had been referred to BLG. [2004 examination at 8.] Select then transferred the $1,199.00, plus the financial information which the Debtor had provided to Select, to BLG, a law firm which occupies a suite within the same Pasadena, California office complex as Select. [Show Cause Hearing at 3:58[2], 4:40.] Select directly transferred the Debtor via telephone to BLG, and the Debtor spoke with two paralegals, who promised the Debtor that BLG would send her the paperwork relating to her bankruptcy. [2004 examination at 9-10.]

7. J. Arthur Bernal (Bernal), president and owner of BLG, testified that a debtor who falls out of or does not qualify for one of Select's programs is automatically referred to his firm. [Show Cause Hearing at 4:39.] He could not account for how Select arrived at the figure of $1,199.00 for BLG's services. [*Id.* at 4:51.]

8. Bernal is licensed to practice law in the State of California and the United States Bankruptcy Court, Central District of California. [Bernal's Responsive

---

[1] The packet Select sent to the Debtor was written in Spanish. A significant portion of the packet was translated using an on-line translation tool, http://dictionary.reference.com. The website specifically notes that it cannot provide a perfect translation but should be adequate to convey the general sense of the original.
[2] Citations to the Show Cause Hearing are references to the FTR recordings.

Declaration.] Bernal is not licensed to practice law in the State of Texas and is not admitted to practice in the Southern District of Texas.

9. On October 19, 2004, BLG entered into an Attorney Referral Agreement (Referral Agreement) with Craig to retain him as local counsel for bankruptcy cases in Houston. [Telefax letter from Bernal to Craig (Oct. 19, 2004).] The agreement provided that BLG would render limited services, such as "qualify potential bankruptcy clients and obtain information necessary to prepare a bankruptcy petition." [*Id*.] BLG agreed to collect the attorney fee, package each client's information, and send the information, along with a portion of the fee, to Craig. [*Id*.] As to the splitting of the fee, the contract provides, "Bernal Law Group will retain part of the attorney fees collected for the services it renders and will pay a negotiated fee to the retained attorney in order to prepare and file a bankruptcy petition and attend the 341(a) meeting of creditors." [*Id*.]

10. Shortly after November 8, 2004, the Debtor received a packet of information from BLG. This packet included a "Services Benefit Contract" (the Contract)[3] for the "legal services of the lawyer [J. Arthur Bernal]", as well as forms concerning the Debtor's financial condition. [BLG packet, Trustee Ex. 3.]

11. The Debtor's contract with BLG stated that Bernal would prepare and file her bankruptcy petition and attend the §341 meeting of creditors. It also authorized Bernal to contact and use the services of local lawyers in the state in which the bankruptcy would be filed. [BLG packet, Trustee Ex. 3.]

12. The Debtor signed the contract, filled in her financial information to the best of her ability, and returned all documents to BLG. [2004 examination at 10.] Subsequently, the Debtor had several telephone conversations with a paralegal at BLG named Corina. During these conversations, Corina solicited information from the Debtor in order to complete the forms concerning the Debtor's financial condition. [Show Cause Hearing at 4:03]; [2004 examination at 10-11.]

13. BLG informed the Debtor that she needed to attend the § 341 meeting of creditors and that Craig would serve as her local counsel and attend this meeting with her.

---

[3] *See supra*, note 1.

[2004 examination at 24.]  BLG arranged for the Debtor to meet with Craig and gave her instructions to Craig's office.  [*Id.* at 12.]

14. Craig is not admitted to practice law in the Southern District of Texas.  Moreover, due to some prior issues undisclosed in this case, when Craig was initially admitted to practice law in the State of Texas, he was issued a probationary license from the State Bar of Texas.  While practicing with this probationary license, Craig spent a few days in jail due to a traffic ticket dispute in Washington County, Texas.  As a result of the traffic ticket incident, the State Bar of Texas extended Craig's probationary license, which he still uses to practice law.  Craig failed to disclose his status to practice law until the hearing held on July 20, 2005.  Even then, he reluctantly disclosed this information only after this Court pointedly asked him certain questions.  Indeed, Craig conceded that he was not eligible to practice in the Southern District of Texas due to his probationary status.  Craig currently has two other cases pending in Bankruptcy Courts in the Southern District of Texas in which he was hired by Bernal in the same capacity as the case at bar.[4]  [Show Cause Hearing at 5:20-22.]

15. Because Craig lacked the software to draft the Debtor's Chapter 7 bankruptcy petition, Schedules, and SOFA, an attorney with BLG prepared these documents.[5]  [Show Cause Hearing at 3:59.]  The BLG attorney used the information provided directly by the Debtor to BLG, along with the Debtor's financial data that Select had transferred to BLG.  [*Id.* at 3:58, 4:03, 4:11.]  In preparing these documents, BLG selected the Texas exemption scheme.  [*Id.* At 4:03, 4:12, 4:13, 5:08.]  BLG also prepared the Rule 2016(b) Disclosure Statement for Craig, as well as a document entitled "Declaration Re: Limited Scope of Appearance Pursuant to Local Bankruptcy Rule 2090-1," (California Local Bankruptcy Rule 2090-1 form) a form required by a Local Bankruptcy Rule of the Central District of California.[6]

---

[4] Jesus Barrientos (Case No. 05-33417) and Dominga Ramos (Case No. 05-33885).  At the Show Cause Hearing, Bernal indicated that Ms. Andrea Vasquez, an attorney from Austin, Texas, would substitute in for Craig in these cases.

[5] Bernal indicated a Mr. Juan Onofrey, an attorney employed by BLG, actually prepared the documents.

[6] The Southern District of Texas does not have a Local Rule 2090-1.  This rule is promulgated by the United States Bankruptcy Court for the Central District of California, LBR 2090-1 (May 3, 2004).

BLG sent these documents to Craig for filing in the Southern District of Texas. [*Id.* at 3:59.]

16. The Debtor met with Craig two times before Craig filed her bankruptcy petition, Schedules, and SOFA. [2004 examination at 12.] At their initial meeting, the Debtor signed the documents related to her bankruptcy. [*Id.* at 13.] At their second meeting, the Debtor provided Craig with $209.00 for court filing fees. [*Id.* at 13.] Because Craig does not speak Spanish, a translator was present at both meetings via telephone. [*Id.* at 14.] This translator was an employee with BLG.

17. The Debtor testified that she spent much more time discussing her bankruptcy with the paralegals at BLG than with Craig. [2004 examination at 29.]

18. On March 7, 2005, the Debtor filed a voluntary petition for Chapter 7 bankruptcy with this Court. Craig signed the petition as the Debtor's attorney. [Ex. 1 of Trustee Ex. 4.]

19. On "Schedule A-Real Property," the Debtor indicated that she has a one-half interest in the residence at 182 Glaze Brook, Houston, Texas. [Ex. 1 of Trustee Ex. 4.]

20. On "Schedule F-Creditors Holding Unsecured Nonpriority Claims," the Debtor did not list her current, non-debtor husband. [Ex. 1 of Trustee Ex. 4.]

21. On her SOFA, under question "9. Payments related to debt counseling or bankruptcy," the Debtor identified herself as the "payor" of $500.00 to Craig and $699.00 to J. Arthur Bernal. Under question "16. Spouses and Former Spouses," the Debtor checked the box marked "None." [Ex. 1 of Trustee Ex. 4.]

22. In the "Statement Pursuant to Rule 2016(b)," Craig listed compensation paid or agreed to be paid by the Debtor to him as an "unpaid balance due and payable" of $1,199.00. The pre-printed 2016(b) Disclosure shows that Craig will provide or has provided: (a) analysis of the financial situation, and rendering advice and assistance to the Debtor in determining whether to file a petition under Title 11 of the United States Code; (b) preparation and filing of the Petition, Schedules, Statement of Financial Affairs and other documents required by the Court; and (c) representation of the Debtor at the meeting of creditors. Attached to this document, Craig included the California Local Bankruptcy Rule 2090-1 form. On

this form, to identify the services he agreed to render, Craig checked a box marked "Represent the Debtor at the 341(a) Meeting; he did not check the box marked "Prepare and file the Petition and Schedules." Craig signed both of these forms. [Ex. 1 of Trustee Ex. 4, also Docket No. 1.]

23. The §341 meeting of creditors was held on April 4, 2005. Craig represented the Debtor at this meeting. However, prior to the meeting, BLG instructed the Debtor to bring her own translator[7]. [2004 examination at 24.]

24. At the §341 meeting, the Trustee requested that Craig amend question "9. Payments related to debt counseling or bankruptcy" on the SOFA and the "Statement Pursuant to Rule 2016(b)." [Show Cause Hearing at 4:07.] Bernal testified that his firm, BLG, made these amendments and then sent the documents to Craig for filing with this Court. [*Id.* at 4:07, 4:44, 5:18.] Craig did not file these documents. [*Id.*]

25. On April 22, 2005, the Trustee filed a motion to show cause to clarify the relationship among Select, BLG, and Craig, including whether their agreement resulted in the unauthorized practice of law or illegal fee sharing arrangements. [Motion to Show Cause, Docket No. 7.]

26. On July 13, 2005, the Trustee and U.S. Trustee conducted a Rule 2004 oral examination of the Debtor. The Debtor was not represented by counsel at this examination. [2004 examination at 4.] The Debtor testified that two individuals at BLG — Corina, one of the legal assistants, and an attorney with BLG — told her she was not required to attend the 2004 examination or the show cause hearing in this Court. [*Id.* at 26-27.]

27. On July 20, 2005, the U.S. Trustee filed a response to the Trustee's motion. The U.S. Trustee requested that this Court disgorge the fees received by Select, BLG, and Craig, require them to pay all costs incurred by the Trustee in investigating this matter, and assess any other appropriate sanctions. [Response of the U.S. Trustee.]

---

[7] Bernal testified that Craig was supposed to provide a translator. Because the Debtor testified that during a phone conversation she had with BLG, BLG instructed the Debtor to bring her own translator, this Court can only assume that Craig was either unwilling or unable to find a translator for the Debtor.

28. On July 20, 2005, a hearing was held on the Trustee's motion to show cause and the U.S. Trustee's response.

29. Bernal testified that his firm, BLG, is willing to disgorge all fees paid by the Debtor and to reimburse the Trustee for all of his costs resulting from this investigation. [Show Cause Hearing at 4:01.] The Trustee's costs include: court reporter fees (service and transcript) of $357.94, a witness fee paid to the Debtor for her appearance at the Rule 2004 examination of $45.00, and attorney fees totaling $1,620.00 (8.1 hours at $200.00 per hour) paid to Allison Bynam, an associate with the law firm of Thompson Knight, for her assistance in this matter. The Trustee's costs total $2,022.94. [*Id.* at 5:01.]

### III. CONCLUSIONS OF LAW

"Attorneys who practice before a bankruptcy court must not only concern themselves with the obligations set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules), but also with the application of state ethical rules." *In re Van Dyke*, 296 B.R. 591, 594 (Bankr. D. Mass. 2003) (*quoting In re Soulisak*, 227 B.R. 77, 80 (Bankr. E.D. Va. 1998) (footnote omitted)). The Local Rules of the United States District Court for the Southern District of Texas (the DLR) incorporate the disciplinary rules of the State of Texas; these disciplinary rules govern the ethical standards of members of the bar. *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1258 n.8 (5th Cir. 1986) (*citing Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978)). Thus, the conduct displayed by BLG, Bernal, and Craig is subject to the: (1) Bankruptcy Code and Bankruptcy Rules; (2) Local Rules of the United States Bankruptcy Court for the Southern District of Texas (Bankruptcy Local Rules); (3) the DLR; and (4) Texas Disciplinary Rules of Professional Conduct (the Texas Disciplinary Rules).

**A.    VIOLATIONS OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Any attorney representing a debtor in a Chapter 7 bankruptcy case is required to report all compensation paid or agreed to be paid for services rendered.[8]  11 U.S.C. § 329 (2005).  Additionally, Bankruptcy Rule 2016(b) requires full disclosure of compensation paid to the debtor's attorney.  Fed. R. Bank. P. 2016(b) (2005).  Bankruptcy Rule 2016(b) states that "[e]very attorney for a debtor . . . shall file and transmit to the United States trustee . . . the statement required by § 329 of the [Bankruptcy] Code including whether the attorney has shared or agreed to share the compensation with any other entity."  *Id.*  Further, "[the] statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required."  *Id.*  The Fifth Circuit has held that the failure to disclose a fee sharing agreement under § 329 or filing an inaccurate and false statement under Fed. R. Bank. P. 2016(b) warrants the denial of attorney fees.  *Arens v. Boughton (Matter of Prudhomme)*, 43 F.3d 1000, 1003 (5th Cir. 1995).

In the case at bar, there was no initial disclosure of Select's involvement with the Debtor or BLG.  [Findings of Fact, ¶¶ 21, 24]  The Debtor originally contacted Select's offices, which are located in California, after viewing Select's television commercial offering debt-relief programs.  [Findings of Fact, ¶ 3.]  After recommending that the Debtor file for bankruptcy, Select sought and received payment from her in the amount of $1,199.00.  [Findings of Fact, ¶ 4.]  Select then transferred this money, along with the Debtor's financial information, to BLG, which offices in the same building as Select and to whom Select automatically transfers potential bankruptcy clients.  [Findings of Fact, ¶¶ 6 and 7.]  BLG received the Debtor's full payment of $1,199.00 from Select.  [*Id.*]  Despite this arrangement, BLG and Craig failed to disclose Select's involvement in first procuring and then transferring the fee to BLG.

---

[8]  11 U.S.C. § 329(a) states, "Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation."

Further, BLG and Craig failed to accurately disclose the compensation, which is required to be filed with the court under Bankruptcy Rule 2016(b). [Findings of Fact, ¶ 22.] The 2016(b) Disclosure that Craig filed inaccurately stated that he had not yet received payment from the Debtor and that $1,199.00 was due from the Debtor. [*Id.*] However, in response to question number nine on the SOFA, BLG listed the $1,199.00 as already paid. [Findings of Fact, ¶ 21.] Not only do these disclosures directly contradict each other, the "failure to disclose the fees [they] received [on the 2016(b) statement] constitutes a fraud on this court." *In re Davila*, 210 B.R. 727, 731 (Bankr. S.D. Tex. 1996).

## B.   VIOLATIONS OF THE BANKRUPTCY LOCAL RULES

Bankruptcy Local Rule 1002(b) requires that all petitions show "an alphabetized mailing list of all creditors showing their complete names and addresses, including zip codes." Bankruptcy Local Rule 1002(b) (Jan. 1, 1993), available via the United States District Court and Bankruptcy Court, Southern District of Texas website at http://www.txs.uscourts.gov. Subsequently, this same Rule states, "When there is a nondebtor spouse, the list of creditors shall include the complete name and address, including zip code of the nondebtor spouse..." *Id.* Finally, Appendix B and Appendix C of the Bankruptcy Local Rules set forth the specific format and particular requirements for the mailing list. Bankruptcy Local Rule, Appendix B and Appendix C (Jan. 1, 1993). In particular, Appendix C requires that the mailing list begin with the debtor first, then the debtor's attorney, and then all creditors. *Id.*

The mailing list filed by Craig fails to comply with Bankruptcy Local Rule 1002(b). First, the Debtor's spouse was not included on the list of creditors. [Findings of Fact, ¶ 20.] Second, the Debtor and her attorneys were listed near the end of the mailing list, after the creditors. Moreover, the Debtor's attorneys were listed before the Debtor. Craig was hired by Bernal to represent the Debtor as local counsel. [Findings of Fact, ¶ 9.] It is this Court's view that all counsel of record—and certainly local counsel—should be familiar with and adhere to the various local rules and procedures of this

District. Craig's conduct demonstrates a patent lack of knowledge and familiarity with the Bankruptcy Local Rules.[9]

## C.   VIOLATIONS OF THE LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS

Bankruptcy Local Rule 1001(e) states that admission, designation, and discipline of attorneys practicing before the Bankruptcy Court for the Southern District of Texas (the Bankruptcy Court) are governed by the Southern District Local Rules. Bankruptcy Local Rule 1001(e) (Jan.1, 1993). Specifically, DLR 83.1 addresses the admission to practice in the District Court for the Southern District of Texas (the District Court). *See* DLR 83.1 (May 1, 2000), available via the United States District and Bankruptcy Court, Southern District of Texas website at http://www.txs.uscourts.gov. According to this particular local rule, an attorney must apply for admission to practice before the District Court and, hence, the Bankruptcy Court. DLR 83.1.C. There are two ways an attorney may gain admission to practice in the courts of the Southern District of Texas: (1) file a written application and obtain approval with the clerk of court issuing a Certificate of Admission. This approval allows an attorney to practice at all times in the Southern District of Texas; or (2) obtain permission from the judge before whom the case or adversary proceeding is pending. This approval allows an attorney to serve as attorney-in-charge, or as an attorney assisting the attorney-in-charge, in a specific case or adversary proceeding until its completion.[10]

Neither Craig nor Bernal has been admitted to practice in the Southern District of Texas. [Findings of Fact, ¶¶ 8, 14.] Bernal is licensed to practice law in the State of California. [Findings of Fact, ¶ 8.] However, he has never applied for general admission to the Southern District of Texas; nor has he ever filed an application to practice *pro hac vice* in this particular Chapter 7 case. Craig currently holds a probationary law license from the State of Texas. [Findings of Fact, ¶ 14.] However, like Bernal, he has never

---

[9] This Court's conclusion about Craig should not be construed as excusing BLG's ignorance of these local rules.

[10] Generally referred to as practicing *pro hac vice*, an un-admitted attorney may ask for leave of the adjudicating court to represent a client in a case on a one time basis.

applied for general admission to the Southern District of Texas; nor has he filed an application to practice *pro hac vice* in this pending Chapter 7 case.[11]

Craig's participation in this case is particularly egregious because of the history of his law license. When Craig was first admitted to practice law in Texas, the State Bar of Texas issued him a probationary license. [Findings of Fact, ¶ 14.] His explanation to this Court regarding his probationary status was as follows:

> The initial probation was for issues that occurred prior to me [sic] practicing law.  Once I did acquire my [probationary] license to practice law, I had a traffic ticket issue which blew out of proportion in Washington County, which resulted in me spending a few days in jail, which concerned the State Bar because at the time I was still issued a probationary license, so they extended the probationary period.

[Show Cause Hearing at 5:21.] Additionally, when this Court asked Craig why he had not applied for admission to the Southern District, he responded, "At the current moment, the State Bar of Texas has issued me a probationary license which precludes me from obtaining a federal license." [*Id.*] Craig then stated:

> I have been told that I do not have to file a *pro hac vice* motion for every case necessarily that is filed in federal court.  [In] some of my federal cases that I have represented people in bankruptcies, I have filed a motion, but because of that information that I have acquired, I did not file one in this particular case.

[*Id.* at 5:20.] Craig did not support his position with any law or rule. Further, he did not reveal from where, how, or from whom he received this information. Nevertheless, instead of submitting an application to practice *pro hac vice* before this Court[12], Craig deliberately ignored this rule, failed to disclose his probationary status, and proceeded to file the Debtor's petition. [Findings of Fact, ¶¶ 14, 18.] Craig's filing of the Debtor's petition exhibited his utter disregard for the Southern District Local Rules and his disrespect for all Southern District Courts.

Bernal and Craig's conduct may merit action under the disciplinary rules of the United States District Court. The conduct of attorneys in the Southern District of Texas

---

[11] A review of the dockets of the other two cases that Craig currently has pending in the Bankruptcy Court indicates that he also has not filed an application to practice *pro hac vice* in those pending Chapter 7 cases. [See Findings of Fact, ¶14 and footnote 4.]

[12] *See supra* note 10.

is governed by the Southern District Local Rules of Discipline (Rules of Discipline); these rules set forth in Appendix A. DLR 83.1.L (May 1, 2000). Any lawyer appearing before the District Court, and hence the Bankruptcy Court, "confers disciplinary jurisdiction upon the court under these rules." DLR, Appendix A, Rule 7 (Oct. 10, 1996). Violations of the disciplinary rules serve as grounds for disciplinary action. DLR, Appendix A, Rule 1.B (Oct. 10, 1996). These disciplinary rules do not limit the judges' inherent powers over lawyers who practice before them. DLR, Appendix A, Rule 10 (Oct. 10, 1996). *See also* DLR, Appendix A, Rule 5A[13] and 5B (Oct. 10. 1996).[14] Not only may Bernal and Craig's practice in the bankruptcy court subject them to disciplinary action under the local rules, they both have actually committed the unauthorized practice of law.

**D.   VIOLATIONS OF THE TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT[15]**

The minimum standard of conduct for any attorney appearing before this Court is set forth in the Texas Disciplinary Rules.  DLR, Appendix A, Rule 1.A; *see also Resolution Trust Corp. v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993) ("[A] federal court may . . . hold attorneys accountable to the state code of professional conduct.")  "An appearance by a lawyer before the court, by writing or in person, confers disciplinary jurisdiction upon the court under these rules." DLR, Appendix A, Rule 7 (Oct. 10, 1996). Both Bernal and Craig appeared before this Court in person at the July 20, 2005 hearing. Moreover, by filing the bankruptcy petition, both Bernal[16] and Craig[17] made an

---

[13] Rule 5A.  Charges that any lawyer of this bar has engaged in conduct, which might warrant disciplinary action, shall be brought to the attention of the court by a writing addressed to the chief judge with a copy to the clerk of court.  This Court will submit a letter, in writing, to the Chief District Judge for the Southern District of Texas, notifying him of the actions of BLG and Craig.

[14] Rule 5B.  Upon receipt of a charge, the chief judge shall refer any non-frivolous charge to a district judge for review to determine whether further disciplinary proceedings should be held. The reviewing judge shall notify the charged lawyer of the charges made and give that lawyer an opportunity to respond.

[15] In Texas, the State Bar rules are treated as statutes.  *Cushnie v. State Bar of Texas*, 845 S.W.2d 358 (Tex. App. – Houston [1st Dist.] 1992, writ denied 1993)).

[16] Bernal testified that he was not directly involved in the Debtor's case and that a Mr. Juan Onofrey, an attorney at BLG, physically prepared the documents.  Show Cause Hearing (July 20, 2005).  However, Bernal testified that Mr. Onofrey did so under Bernal's direction.  Show Cause Hearing (July 20, 2005). Bernal is the president and sole owner of BLG and therefore has certain responsibilities as a partner or supervising lawyer.  Specifically, his responsibilities are as follows:

Rule 5.01.  Responsibilities of a Partner or Supervisory Lawyer.

appearance before this Court.[18]   Therefore, the Texas Disciplinary Rules govern both Bernal and Craig.   Additionally, Texas Disciplinary Rule 8.04 specifically states "[a] lawyer shall not:  (1) violate these rules, . . . or do so through the acts of another, . . . (3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . or (12) violate any other laws of this state relating to the professional conduct of lawyers and to the practice of law." TEX. DISCIPLINARY R. PROF'L CONDUCT 8.04.[19]   By their acts, both Bernal and Craig violated several Rules of Professional Conduct.

### 1.    TEXAS DISCIPLINARY RULE 5.05 - UNAUTHORIZED PRACTICE OF LAW

In Texas, a lawyer shall not:

---

A lawyer shall be subject to discipline because of another lawyer's violation of these rules of professional conduct if:
    a) The lawyer is a partner or supervising lawyer and orders, encourages, or knowingly permits the conduct involved; or
    b) The lawyer is a partner in the law firm in which the other lawyer practices, is the general counsel of a government agency's legal department in which the other lawyer is employed, or has direct supervisory authority over the other lawyer, and with knowledge of the other lawyer's violation of these rules knowingly fails to take reasonable remedial action to avoid or mitigate the consequences of the other lawyer's violation.

Tex. Disciplinary R. Prof'l Conduct 5.01, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A, art. 10, § 9 (Vernon 2005).   Therefore, any reference to BLG or violations committed by BLG are also references to Bernal and violations committed by Bernal.

[17] DLR 11 requires a party to "designate an attorney-in-charge" on first appearance and "[s]igning the pleading effects designation". DLR 11.1. In the case at bar, Craig signed the petition as the Debtor's attorney. Therefore, Craig is the attorney-in-charge.

[18] The DLR provide that "[a]n appearance by a lawyer before the court, *by writing*, or in person, confers disciplinary jurisdiction upon the court under these DLR rules." DLR Appendix A, Rule 7 (emphasis added.) The Fifth Circuit has recently said "[a] party makes a general appearance whenever it invokes the judgment of the court on any question other than jurisdiction. . . . '[in] determining whether conduct is sufficient to be considered a general appearance, the focus is on affirmative action that impliedly recognizes the court's jurisdiction over the parties.'" *Maiz v. Virani*, 311 F.3d 334, 340 (5th Cir. 2002) citing *Jones v. Sheehan, Young, & Culp. P.C.*, 82 F.3d 1334, 1340-41 (5th Cir. 1996). Indeed, the Fifth Circuit has interpreted "appearance" broadly enough to encompass informal acts and has thus found that "appearance" may occur without a party having gone so far as to file documents in the record. *See Sun Bank of Ocala v. Pelican Homestead and Savings Association*, 874 F.2d 274, 276 (5th Cir. 1989). Directly on point, the Tenth Circuit specifically states that "[a]ttorneys who authorize their names to appear on filed papers have entered an appearance." 10th Cir., Cir. R. 46.1 (Jan. 1, 2003). Other courts have held that significant participation by an attorney constitutes an appearance. *See Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995); *see also E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371 (S.D.Tex. 1969) (holding that nonresident attorney's assistance to Houston attorney and Houston client was sufficient to establish jurisdiction over nonresident attorney for disciplinary purposes, even though no formal appearance was entered. The weight of these decisions is persuasive, and therefore this Court holds that the significant participation of BLG and Bernal constitutes an appearance in this Court.

[19] All citations to the Texas Disciplinary Rules are reprinted in the Tex. Gov't Code Ann., tit. 2, subtit. G, app. A, art. 10, § 9 (Vernon 2005).

(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or

(b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

TEX. DISCIPLINARY R. PROF'L CONDUCT 5.05.

In Texas, the practice of law is defined as:

(a) [T]he preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined.

(b) The definition in this section is not exclusive and does not deprive the judicial branch of the power and authority under both this chapter and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law.

TEX. GOV'T CODE ANN. § 81.101(a)(b) (Vernon 2005).

Did BLG, Bernal and Craig violate section 81.01(a) or (b) or both?  A case from Georgia suggests that they violated both.  In *In re Babies*, 315 B.R. 785 (Bankr. N.D. Ga. 2004), the debtors, living in Georgia, contacted a credit counseling service located out of state.  *Id.* at 789.  The credit counseling service told the debtors to consider bankruptcy and referred the debtors to bankruptcy attorneys in Chicago, Illinois.  The Chicago attorneys sent the debtors a questionnaire, which the debtors completed and returned. The Chicago attorneys also had the debtors sign a "Client Agreement" and prepared the petition, schedules, and SOFA.  *Id.*  After the paperwork was filled out, the Chicago attorneys contacted local counsel for assistance in reviewing the paperwork, filing the bankruptcy petition, and appearing at the § 341 meeting of creditors.  When the documents needed amending, the Chicago attorneys made the changes at the request of local counsel and sent the documents back to local counsel.  *Id.*  The Rule 2016 Disclosure Statement filed was defective because it did not properly disclose the nature of the fee sharing arrangement or scope of representation.  *Id.* at 789-90.

In assessing these facts, the court in *Babies* concluded:

15

The operation of the Chicago Attorneys' referral program shows plainly that they intended to provide legal services to residents of Georgia with regard to bankruptcy matters in Georgia on an "all comers" basis. Their referral program, through which they acquired Debtors as clients, targets financially distressed individuals in Georgia and other states; through it, the Chicago Attorneys hold themselves out as being ready, willing, and able to provide legal services to residents of such states, including Georgia, in connection with the filing of a bankruptcy petition in the client's state. They delivered their legal services to their clients in Georgia by way of telephone and the United States mail.

*Id.* at 792. The court held that the Chicago attorneys' conduct constituted the unauthorized practice of law in Georgia. *Id.* at 793.

a. **BERNAL AND BLG**

Like the attorneys in *Babies*, the Debtor was referred to BLG, an out-of-state law firm, after she contacted a credit counseling service and was told that she did not qualify for one of its programs. [Findings of Fact, ¶¶ 3, 6.] BLG counseled the Debtor on the phone, and then sent her forms to complete and the Contract to sign that stated the Debtor "contracts the legal services of the lawyer [J. Arthur Bernal.]" [Findings of Fact, ¶¶ 10, 12.] The Contract also stated that Bernal would prepare and file the bankruptcy petition as well as represent her at the § 341 meeting of creditors. [Findings of Fact, ¶ 11.] Also like the debtors in *Babies*, the Debtor filled out the forms and returned the packet to BLG. [Findings of Fact, ¶ 12.] The only difference in the case at bar is that the Debtor completed the forms with the assistance of Spanish-speaking paralegals at BLG. [*Id.*] BLG prepared the bankruptcy petition, Schedules, SOFA, the 2016(b) Disclosure Statement and even a California Local Bankruptcy Rule 2090-1 form. [Findings of Fact, ¶ 15.] BLG sent these forms to Craig so that he could assist the Debtor in filing the papers and help represent her at the § 341 meeting of creditors. [Findings of Fact, ¶¶ 15, 23.] When the schedules needed amending, BLG made those changes and sent the documents back to Craig, but Craig failed to file them. [Findings of Fact, ¶ 24.]

Bernal defends BLG's actions by stating that Select, a national company, refers clients from "many states" to his law firm and his office simply screens and qualifies them before contacting local counsel in the client's home state. [Bernal's Responsive Declaration at 2, ¶ 5, *In re Zuniga*, No. 05-33416-H4-7 (S.D. Tex. May 12, 2005).]

However, by "collecting the necessary information required for bankruptcy" and "explaining what bankruptcy does and how it works," [*id.* ¶ 6.] BLG was "hold[ing] themselves out as being ready, willing and able to provide legal services to residents" of Texas. *Babies*, 315 B.R. at 792. BLG "prepar[ed] ... a pleading or other document incident to an action or special proceeding ... on behalf of a client before a judge in court ..." and "[rendered] a [service] out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined." TEX. GOV'T CODE ANN. § 81.101(a) (Vernon 2005). BLG selected the Texas exemption rather than the federal exemption [Findings of Fact, ¶ 15],[20] the legal effect of which most certainly requires careful determination. BLG made decisions based on Texas law, but was unfamiliar with Texas law. Indeed, as the Trustee pointed out during the show cause hearing, the Debtor was worse off with the chosen Texas exemption rather than the federal exemption due to the lack of equity in her home. [Show Cause Hearing at 5:08.] At the very least, the federal exemption would have allowed the Debtor to exempt cash. 11 U.S.C. § 522(d) Like the attorneys in *Babies*, BLG delivered its services to an out-of-state debtor (in Texas as opposed to Georgia) via telephone and U.S. mail; therefore, BLG was practicing law in the State of Texas. *Babies*, 315 B.R. at 792.

Texas requires membership in the State Bar before a person may practice law. TEX. GOV'T CODE ANN. §§ 81.051, 81.102(a) (Vernon 2005).[21] Neither Bernal nor any other attorney acting under his direction was a member of the State Bar of Texas when they spoke with the Debtor on the phone to discuss whether she needed to file

---

[20] Bernal testified that after BLG had prepared the "petition, forms and documents" and selected the exemptions, the actual choice of exemptions "would be in consultation with Mr. Craig." [Show Cause Hearing at 4:12-13.] When asked directly if it was the recommendation of his firm that Ms. Zuniga use the Texas exemption scheme, Bernal initially responded by asking if the question meant "as opposed to some other State's [exemption scheme]?" After being told that the choice was either the *Texas* exemption scheme or the *federal* exemption scheme, Bernal responded "I don't know because Mr. Onofrey [of BLG] was the one who talked to Mr. Craig." [*Id.* At 4:13]. It is clear to this Court that neither BLG nor Craig knew which exemption statute was best for the Debtor.

[21] This Court also notes that California has similar statutory provisions. *See* Cal. State Bar Rule Prof'l Conduct R. 1-300(B) (May 27, 1989) "A member shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction." *See also* Cal. Bus. & Prof. Code § 6125 (West 2003) ("No person shall practice law in California unless the person is an active member of the State Bar.")

bankruptcy. No one at BLG was a member of the State Bar of Texas when they solicited information from the Debtor and prepared her petition and Schedules. No one at BLG was admitted to appear regularly in the United States District Court for the Southern District of Texas, nor did anyone at BLG ever seek leave of this Court to be admitted *pro hac vice*. Under Texas law, BLG and Bernal, as president of BLG, were engaged in the unauthorized practice of law.[22] TEX. GOV'T CODE ANN. § 83.006 (Vernon 2005).

### b. LOCAL COUNSEL CRAIG

As discussed *supra*, Craig is a probationary licensed member of State Bar of Texas, but he is not admitted to the Southern District of Texas and did not seek permission of this Court to appear *pro hac vice*. [Findings of Fact, ¶ 14.] Craig filed the bankruptcy petition prepared by BLG, signed the petition as attorney of record, and appeared at the § 341 meeting of creditors as Debtor's counsel. [Findings of Fact, ¶¶ 18, 23.] Additionally, Craig entered into a contract with BLG that specifically stated the arrangement was for a "qualified bankruptcy attorney" and that Craig would be responsible for "represent[ing] the client until discharge of the client's bankruptcy, subject to the client's payment for any additional services . . . ." [Findings of Fact, ¶ 9.] [Telefax letter from Bernal to Craig (Oct. 19, 2004).] Craig "[rendered] a [service] out of court" that "require[ed] the use of legal skill or knowledge … the legal effect of which under the facts and conclusions involved must be carefully determined." TEX. GOV'T CODE ANN. § 81.101(a) (Vernon 2005). Additionally, a judge has the "power and authority … to determine whether other services and acts not enumerated may constitute the practice of law." TEX. GOV'T CODE ANN. § 81.101(b) (Vernon 2005). Therefore, even if Craig did not prepare the documents, signing his name as the Debtor's attorney and filing documents with the Bankruptcy Court, without properly verifying the information contained in those documents, constitutes the practice of law. Craig was practicing law in the Southern District of Texas without leave of the District Court or this Court and therefore violated DLR 83.1K. Thus, he engaged in the unauthorized practice of law. *See also* TEX. CODE GOV'T § 81.101(a)(b) (Vernon 2004), TEX. DISCIPLINARY R. PROF'L CONDUCT 5.05.

---

[22] *See also Birbrower v. Superior Court*, 949 P.2d 1, 5 (Cal. 1998) (practice of law includes giving legal advice and preparing legal documents; one may practice law in California although not physically present in the state by advising a California client on California law in connection with a California legal issue.)

2.   **TEXAS DISCIPLINARY RULE 1.03 - COMMUNICATION**

Texas Disciplinary Rule 1.03 states that:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03.

Neither Craig nor Bernal kept the Debtor reasonably informed about the status of her bankruptcy. Additionally, they failed to explain the applicable law and procedures to the extent reasonably necessary to permit her to make informed decisions regarding her disclosures, her options, her choices and later the status of her case. The Debtor works as a janitor for the Aldine School District and earns minimal wages; she does not understand English. [Findings of Fact, ¶ 1.] The legal system itself, and the bankruptcy process in particular, is not intuitive; even well educated, native English speakers have difficulty understanding the process without proper explanation. The Debtor was not properly informed of the bankruptcy process or of the respective duties of BLG and Craig.

The Debtor first spoke to BLG after she finished making her payments to Select, which was on September 7, 2004. [Findings of Fact, ¶ 6.] BLG did not send her the necessary paperwork until November 8, 2004, two months after she finished making her payments. [Findings of Fact, ¶ 10.] The Debtor's dire financial situation prompted her to contact Select after watching its television commercial, but the paperwork to begin the process was not sent to the Debtor until well after the attorney's fee had been paid. Bernal stated he did not know why two months went by before the paperwork was sent to the Debtor. [Show Cause Hearing at 4:59.] If Bernal himself did not know the status, it is not likely the Debtor was kept reasonably informed.

BLG did provide the Debtor with a translator who was familiar with the bankruptcy process, but they never met with her face-to-face [Findings of Fact, ¶¶ 6,12]; counseling step-by-step bankruptcy procedures took place over the phone and via mail, a difficult, if not entirely unprofessional, approach. The Debtor herself stated that she was

19

not clear about everything because talking over the phone was not the same as talking face-to-face. [Show Cause Hearing at 3:43.]

BLG also filled out the bankruptcy petition, but did not correctly fill out the Schedules, SOFA or the 2016(b) Disclosure. [Findings of Fact, ¶¶ 15, 20-22, 24.] When Craig had the Debtor sign these incorrect forms, which he represented to the Court that he had reviewed, the Debtor was signing documents that she could not read or understand. Moreover, she was executing the documents under penalty of perjury.   Additionally, BLG told the Debtor her appearance at the 2004 examination was not necessary and to disregard letters and notices she had received, including the hearing on the U.S. Trustee's motion to show cause. [Findings of Fact, ¶ 26.]   BLG told the Debtor the matter was "closed" and "done" and she did not have to do anything else. [2004 examination at 27.] If the Debtor had followed BLG's advice, she could have been sanctioned by this Court.

Craig was unable to keep the Debtor reasonably informed because he had no way of communicating with her.   The Debtor speaks only Spanish; Craig speaks only English. [Findings of Fact, ¶¶ 1, 16.]   He did not arrange for a translator to be physically present during their meetings at his office.   [Findings of Fact, ¶¶ 16.]   A translator at BLG's office in California apparently explained the documents to the Debtor over the phone. [*Id.*]   Although the Debtor stated the translator was "good," she felt the translation was not sufficient to understand what she was signing.   [2004 examination at 23]; [Show Cause Hearing at 3:46.]   The translator was not on a speakerphone, and therefore he could not contemporaneously translate specific portions of the documents; he told the Debtor just to sign the documents.   *Id.*   Additionally, because Craig could not communicate with the Debtor, BLG told the Debtor she would have to bring her own interpreter to the § 341 meeting of creditors, instead of being provided one who could communicate the intricacies of the bankruptcy process effectively.   [Findings of Fact, ¶ 23.]   Craig also did not disclose to the Debtor that he would not be able to legally represent her in bankruptcy court because he was not admitted in the Southern District of Texas.   Craig failed to "zealously pursue" the Debtor's interests and provide her with an informed understanding of her legal rights.   TEX. DISCIPLINARY R. PROF'L CONDUCT PREAMBLE.

### 3.    TEXAS DISCIPLINARY RULE 1.04 – FEES

Texas Disciplinary Rule 1.04[23] prohibits lawyers from collecting unconscionable fees. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a)(b).  A fee is unconscionable if it is unreasonable.  *Id.*  In determining the reasonableness of a fee, a court may consider:  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; . . . (4) the amount involved and the results obtained;  . . . and (7) the experience, reputation, and ability of the lawyer or lawyers performing the services. . . . TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b).

The fee received by both Bernal and Craig was unreasonable.  Neither attorney had the "skill requisite to perform the legal service properly." *Id.*  This conclusion is apparent in light of both attorneys' failures to abide by the local rules and communicate properly with the Debtor.  Bernal, although admitted in the Central District of California and practicing bankruptcy there, has little, if any, experience practicing bankruptcy in the Southern District of Texas.[24]  The inaccuracies in Debtor's petition, Schedules, SOFA, and the 2016(b) Disclosure drafted by BLG, plus the use of the California form, underscores BLG's lack of familiarity with the rules of the Southern District of Texas.

One purpose of obtaining local counsel is to retain someone familiar with the local rules of a given jurisdiction.  A diligent bankruptcy attorney, familiar with the local rules, would have recognized the errors in the Debtor's petition and the extraneous California Local Rule 2090-1 form.   Unfortunately, Craig's only experience in bankruptcy matters is in this case and two cases similar to this one.  [Findings of Fact, ¶ 14.]  Craig was woefully unfamiliar with the local rules when he filed the pleadings on behalf of the Debtor.  The California Local Rule 2090-1 form that Craig erroneously filed is a prime example of his ignorance.  *See* [Ex. 1 of Trustee Ex. 4.]  At the show cause hearing, Craig stated that he filed this form because it was "optional" and he was being cautious by including it.  [Show Cause Hearing at 5:19.]  The form may well be optional in the Central District of California, but it is not required *or* optional in the Southern

---

[23] Rule 1.04 was amended by the Texas Legislature on Jan. 28, 2005 and was effective as of March 1, 2005. Because the conduct in the case at bar concerning the collection of fees occurred prior to the amendment, the earlier version applies.
[24] During the show cause hearing, Bernal stated he had been taking out of state referrals from Select for less than a year.

District of Texas.  Because of Craig's lack of skill and experience, the Debtor was not as well served as she should have been.  Indeed, due to Craig's errors — and BLG's errors — the Debtor had to undergo a 2004 examination on July 13, 2005 and appear in this Court on July 20, 2005.

Disciplinary Rule 1.04 also requires lawyers to communicate the basis of their fee to their clients when they have not regularly represented the client.  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(c).  In addition, this Rule explicitly prohibits fee splitting unless the fee is split in proportion to the services performed by each lawyer; made with a forwarding lawyer; or made between lawyers who assume joint responsibility for the client's representation, but only with the written agreement of the client.  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(f)(1).  Rule 1.04 also requires the lawyer to advise the client of the fee splitting arrangement.  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(f)(2).

Proportionality of splitting the $1,199.00 fee:  Craig and BLG entered into a Referral Agreement but such agreement does not shed light on the division of services to determine if the fee was proportional to each parties' respective duties.  This agreement states that Craig would be responsible for preparing and filing the petition, Schedules, and SOFA, and representing debtors at § 341 meeting of creditors.  These are the same services Bernal stated he would provide in the Contract with the Debtor.  [Trustee Ex. 3, *In re Zuniga*, No. 05-33416-H4-7 (S.D. Tex. July 20, 2005)].  The Referral Agreement further states that BLG will only be providing "limited services...such as gathering information necessary to prepare the bankruptcy petition, collecting creditor information, and budget and financial information."  *See* [Telefax letter from Bernal to Craig, (Oct. 19, 2004)].  If BLG's services were indeed so limited, it would be odd for BLG to keep the majority of the fee, *see In re Babies*, 315 B.R. at 794; yet, BLG kept $699.00 of the $1,199.00 fee paid by the Debtor.  BLG's actual fee of $699.00 was disproportionate to the limited services described in the Referral Agreement.

Forwarding lawyer:  A forwarding lawyer refers a case to another attorney and receives a fee for such a referral.  *See, e.g., Kuhn, Collins, & Rash v. Reynolds*, 614 S.W.2d 854 (Tex. Civ. App.—Texarkana 1981, writ ref'd n.r.e.).  Typically, a forwarding attorney does not maintain involvement in the case.  *See id.*, (identifying one attorney as

the forwarding attorney and the other attorney as the one handling the case).  In the case at bar, BLG assisted the Debtor after the paperwork had been sent to Craig, amended the petition after the meeting of creditors, and gave advice regarding letters and notices the Debtor received.  BLG maintained involvement in this case, and was therefore not a forwarding attorney.

Written Agreement:  The Fifth Circuit recently held that a statement authorizing one attorney to "associate other [a]ttorney or [a]ttorneys as they may desire," without identifying that other attorney or setting out the fee splitting arrangement, does not meet the requirements of  Disciplinary Rule 1.04(f)(1)(iii).  *Stone v. Thomas* (*In re Wright*), Nos. 03-50609, 04-50365, 2005 WL 1651655, at *5 (5th Cir. 2005).   In the case at bar, this Court finds that the requirements of Rule 1.04(f)(1)(iii) were not satisfied.   The Contract, which the Debtor signed, does not mention Craig by name; it only states that BLG will "contact and use the services of local counsel."  [Findings of Fact, ¶ 11]; Disciplinary Rule 1.04(f)(1)(iii) requires a written agreement with the client for this type of fee splitting arrangement.  However, BLG told the Debtor, over the phone, whom that local counsel would be and did not obtain the necessary written agreement.  [Findings of Fact, ¶ 13.]

### 4.    TEXAS DISCIPLINARY RULE 3.03. CANDOR TOWARD THE TRIBUNAL

Texas Disciplinary Rule 3.03 states that

> (a) A lawyer shall not knowingly:
>   (1) make a false statement of material fact or law to a tribunal; .

TEX. DISCIPLINARY R. PROF'L CONDUCT 3.03.

BLG and Craig made false statements of material fact to this Court.  The 2016(b) Disclosure inaccurately represents that the fee would be paid to Craig and he would share the fee with Bernal.  [Ex. 1 of Trustee, Ex. 4.]  However, Craig was aware that Bernal would be collecting the fee and remitting a portion to him.  [Findings of Fact, ¶ 9.] Moreover, Craig represented that the $1,199.00 had not been paid as of March 7, 2005, but the Debtor's bank statements show that Select had deducted the full amount by early September 2004.  [Findings of Fact, ¶ 4,6.]  Additionally, Craig submitted the California Local Rule 2090-1 form, which states he is limiting his representation of the Debtor to the § 341 meeting of creditors.  [Findings of Fact, ¶ 22.]  Yet, the 2016(b) Disclosure

represents that he will render, or has rendered, much more than just representation at the § 341 meeting of creditors. *Id.* BLG and Craig failed to disclose Select's involvement in the case, and Craig failed to file the amended SOFA and the 2016(b) Disclosure. [Findings of Fact, ¶¶ 21, 24.] Both BLG and Craig, by preparing and filing defective SOFA, Schedules, and the 2016(b) Disclosure, made false statements of material fact to this Court.

Texas Disciplinary Rule 3.03 applies even if BLG and Craig's actions can be characterized as omissions. TEX. DISCIPLINARY R. PROF'L CONDUCT 3.03, comment 2, ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.") In the case at bar, the U.S. Trustee brought to Craig's attention the omission of Select's involvement on the Debtor's SOFA. [Findings of Fact, ¶ 24.] Although Craig contacted BLG for an amended SOFA, which BLG in fact prepared and sent to Craig, he never filed the amended SOFA.[25] [*Id.*] Consequently, Craig was aware that information was omitted from the Debtor's SOFA and BLG had imputed knowledge of such omission. *See Thomas v. N.A. Chase Manhattan Bank*, 1 F. 3d 320, 325 (5th Cir. 1993) (citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683 689 n. 9 (2nd Cir. 1983)).

Additionally, Craig knew or should have known of the requirements for practicing in the Southern District of Texas, but he failed either to follow them, or he chose to ignore them. *See* [Show Cause Hearing at 5:20.] Perhaps he hoped this Court would: (1) assume he was admitted and not inquire into his status; or (2) gloss over his non-admitted status and allow him to practice in any event. In either case, Craig cannot say he had a good faith belief that this Court would not require him to be admitted in the Southern District of Texas. It is an affirmative requirement. Even if other courts have allowed Craig to practice without being admitted and without obtaining *pro hac vice* status, Craig did not obtain such an exception from this Court. Craig failed to disclose his non-admitted status, and this omission constituted an affirmative misrepresentation.

---

[25] Craig's testimony regarding his not having filed the amended SOFA and 2016(b) statement was as follows: he did not file the amended documents because, after discussions with BLG, he, or he and someone at BLG, concluded that filing the amended SOFA was not necessary. [Show Cause Hearing at 5:18.]

### 5.     RULE 7.02.  COMMUNICATIONS CONCERNING A LAWYERS SERVICES

Rule 7.02 states that:

>     (a) A lawyer shall not make a false or misleading communication about the qualifications or the services of any lawyer or firm. A communication is false or misleading if it:

>     (1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;
>     . . .

>     (5) designates one or more specific areas of practice in an advertisement in the public media or in a written solicitation unless the advertising lawyer is competent to handle legal matters in each such area of practice.

TEX. DISCIPLINARY R. PROF'L CONDUCT 7.02.

On his website[26], Craig represents his firm as practicing in the area of bankruptcy law. He represents as follows:

> Here at *our* firm, *we* strive to make your experience a positive one. *We* are a full-service firm with *many experienced attorneys who specialize in a variety of areas. We* are here to help you with a wide range of legal needs.

> *We've* included information on this site about *our* firm's history, *our* lawyers, and *our* fees. *We* look forward to working with you.

Dion A. Craig, Esq., http://www.oglawyer.com (last visited July 28, 2005) (emphasis added).   Laypersons, not understanding that a lawyer would have to be admitted to practice in the Southern District of Texas, would easily and quite reasonably believe that Craig, or one of his associates, would be able to represent them in bankruptcy matters. However, Craig is listed as the only attorney under "Lawyer Profiles," so the use of the plural, "we" and "our," is confusing and misleading.  Also, because Craig is the only attorney listed under "Lawyer Profiles," a layperson could be misled into believing that Craig himself is qualified; however, as discussed *supra*, Craig is not admitted in the

---

[26] This Court takes judicial notice of the information available on BLG and Craig's websites. *In re AgriBioTech Sec. Litig.*, CV-S-990144, 2000 U.S. Dist. Lexis 5643, at *4 (D. Nv. March 6, 2000) (*citing Modesto Irrigation Dist. v. Pacific Gas & Elec. Co.*, 61 F. Supp. 2d 1058, 1066 (N.D. Cal 1999), *rev'd on other grounds*, No. 99-17069, 2002 U.S. App. LEXIS 25172 (9th Cir. Dec. 6, 2002), *summary judgment granted on remand by*, 309 F. Supp. 2d 1156 (N.D. Cal. 2004)).

Southern District of Texas and therefore may not undertake representation of any debtor in any bankruptcy court in this District.

BLG states that it has a "National Network of Attorneys" who are "ready to work for you in the preparation and presentment of your bankruptcy petition." Bernal Law Group, Inc., http://www.bernallawgroup.com/Service.htm (last visited July 28, 2005). This communication gives laypersons a false impression that BLG is authorized to practice law in a number of jurisdictions.[27] As discussed above, this is not the case, at least not in the Southern District of Texas. While this Court does not issue an opinion regarding other jurisdictions, BLG may not represent to the public that it is able to practice law in the Southern District of Texas without first being admitted to do so.

All in all, by virtue of their respective violations of Texas Disciplinary Rules 8.04, 5.05, 1.03, 1.04, 3.03, and 7.02, both Craig and BLG have exhibited a blatant disregard for the ethical standards to which an attorney should adhere in the practice of law. The overall conduct of Craig, Bernal and Bernal's law firm, BLG, raises serious concerns. The Debtor was entitled to competent and diligent representation.[28] With the recent publicity of professionals implicated in corporate scandals[29], lawyers must vigilant in adhering to the ethical standards of their profession.

6.     SELECT FINANCIAL SOLUTIONS

A bankruptcy court may hear and determine all cases and core proceedings under Title 11. 28 U.S.C. § 157(a) and (b) (2005). Select's initial solicitation of the Debtor was the *sine qua non* of the case at bar. Its representatives informed the Debtor that her only option was bankruptcy, then sent her information regarding bankruptcy, and

---

[27] Indeed, BLG's website lists its hours for different time zones. Bernal Law Group, Inc., http://www.bernallawgroup.com/ContactUs.htm (last visited July 28, 2005).

[28] This is an affirmative requirement for attorneys practicing in Texas. See Texas Disciplinary R. Prof'l Conduct 1.01 (Vernon 2005):

    (a)  A lawyer shall not accept or continue employment in a legal matter which the lawyer knows or should know is beyond the lawyer's competence, . . .

    . . .

    (b)  In representing a client, a lawyer shall not:
        (1)  neglect a legal matter entrusted to the lawyer; or
        (2)  frequently fail to carry out completely the obligations that the lawyer owes to a client or clients.
    (c)  As used in this Rule, "neglect" signifies inattentiveness involving a conscious disregard for the responsibilities owed to a client or clients.

[29] See K. C. Goyer, *Nancy Temples' Duty: Professional Responsibility and the Arthur Andersen Verdict*, 18 Geo J. Legal Ethics 261 (2004) (discussing the professional responsibilities of lawyers).

subsequently transferred the Debtor to BLG from its office.  [Findings of Fact, ¶¶ 4,6.] This Court feels compelled to review Select's involvement in this particular bankruptcy.

A credit services organization must register with the Texas Secretary of State before conducting business in this state.  TEX. FIN. CODE ANN. § 393.101 (Vernon 1998 & Supp. 2004).  A credit services organization is defined as,

> [A] person who provides, or represents that the person can or will provide, for the payment of valuable consideration, any of the following services with respect to the extension of consumer credit by others:
> > (A) improving a consumer's credit history or rating;
> > (B) obtaining an extension of consumer credit for a consumer;
> or
> > (C) *providing advice or assistance to a consumer with regard to Paragraph (A) or (B)*

TEX. FIN. CODE ANN. § 393.001 (Vernon 1998) (emphasis added).  A violation of Ch. 393 is considered a Class B misdemeanor in the State of Texas.  TEX. FIN. CODE ANN. § 393.501 (Vernon 1998).

An organization does not need to state it is a credit services organization for Tex. Fin Code § 393 to apply.  *See, e.g.*, *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433 (5th Cir. 2004) (broker can be a credit services organization).  Select's television commercials target consumers with debt problems and urge them to contact Select for relief from these woes.[30]  [Findings of Fact, ¶ 3.]  The Debtor was prompted to contact Select after viewing one of these ads.  [*Id.*]  Its website states that Select can provide educational materials and information on how to obtain assistance, and further represents that Select can provide advice or assistance to "empower debtors [to] make an informed decision on how to manage, service or liquidate their debts."  The educational materials it provides are "Understanding Bankruptcy, Unpaid Debts, and Debt Collection" and "Understanding Credit Restoration and How to Use It Legally."  Select Financial Solutions, Inc., http://www.selectusa.com (last visited Aug 12, 2005).

Additionally, the materials Select sent to the Debtor indicate the services it provides include obtaining credit and repairing credit.  [Trustee Ex. 2.]  Select represents it can provide assistance to a consumer for improving his/her credit history or rating;

---

[30] Tex. Fin. Code Ann. § 393.306 (Vernon 1998) prohibits a credit services organization from advertising its services if it has not complied with the registration requirement.

therefore, Select is a credit services organization. However, Select is not registered to do business in the State of Texas. *See* Window on State Government, Corporation Search, at http://ecpa.cpa.state.tx.us (last visited Sept. 12, 2005), *see also* Texas Secretary of State, Roger Williams, http://www.sos.state.tx.us.

Non-profit organizations under I.R.C. § 501(c)(3) are exempt from this requirement. TEX. FIN. CODE ANN. § 393.002 (Vernon 1998). Indeed, Bernal testified that Select is a non-profit organization and debt consolidation and counseling center. [Show Cause Hearing at 3:55, 4:40.] However, the Better Business Bureau of the Los Angeles area shows that, contrary to Bernal's representation to this Court, Select is a for-profit company; and the California Department of Corporations does not have Select listed as a non-profit organization. *See* Better Business Bureau, Company Reports at http://www.labbb.org (last visited July 22, 2005); Welcome to California, Department of Corporations, at http://www.corp.ca.gov (last visited Aug. 3, 2005). California, in fact, does not seem to have Select registered at all. *See* Secretary of State Bruce McPherson, at http://kepler.ss.ca.gov (last visited Sept. 12, 2005). Rather, Select is registered in Nevada as a domestic, for profit corporation. *See* Nevada Secretary of State Dean Heller, https://esos.state.nv.us (last visited July 22, 2005). Select is not, therefore, exempt from the registration requirement of the Texas Finance Code.

In addition to registering with the Secretary of State, a credit services organization is required to provide a disclosure statement to the consumer that includes, *inter alia*, "a complete and detailed description of the services to be performed by the organization for the consumer and the total costs of those services" prior to the consumer's execution of a contract. TEX. FIN. CODE ANN. § 393.105(1) (Vernon 1998). The contract for the purchase of services must be in writing, dated, and signed by the consumer. TEX. FIN. CODE ANN. § 393.201(a) (Vernon 1998). Select confirmed everything via telephone, providing the Debtor with a document only after she had "begun" its program. [Findings of Fact, ¶ 5.] The document sent to the Debtor did not describe the services Select would perform, nor did it mention the cost of those services; it was simply a welcome letter to Select's program. [Trustee, Ex. 2.] The letter states, at most, that the Debtor would be receiving educational material within the next couple of weeks to learn how to handle her

budget and reestablish her credit.  *Id.*  Select did not include a complete and detailed description of the services it would perform for the Debtor.

Select also deducted $1,199.00 from the Debtor's bank account before rendering any service to the Debtor.  [Findings of Fact, ¶¶ 4-6.]  Indeed, it appears that Select simply pulled the Debtor's credit record and transmitted this data to BLG; Select apparently did not perform any services for the Debtor.  [*Id.*]  However, even if Select did perform some services, the performance of these services did not warrant deducting $1,199.00 from the Debtor's account, as a credit services organization may not receive valuable consideration prior to completing its services.[31]  TEX. FIN. CODE § 393.302 (Vernon 1998 & Supp. 2004).

Select's welcome letter included a pamphlet regarding bankruptcy.  [Findings of Fact, ¶ 5.]  This pamphlet, among other things, explains what bankruptcy is, the differences between Chapter 7 and Chapter 13, the differences between secured and unsecured debt, and what can be exempted.  [Trustee, Ex. 2.]  Select prepared this pamphlet; its name is conspicuously printed on the front.  *Id.*  The pamphlet does not contain a disclosure that an attorney prepared or assisted in the preparation of the pamphlet.[32]  *Id.*  A Select employee filled out a worksheet on the Debtor when she first called Select.  [Findings of Fact, ¶ 5.]  The box next to bankruptcy is check-marked, and beside that, "#7" is written in the margin.  [*Id.*]  The decision whether to file a chapter 7 or 13 should be made after an attorney explains a debtor's rights and responsibilities, as well as any future consequences.  By determining which type of bankruptcy was best suited for the Debtor and providing the Debtor with a pamphlet that explains what bankruptcy is and how it works, Select was engaged in the unauthorized practice of law.[33]

---

[31] Tex. Fin. Code Ann. § 393.302 states, in full, "[a] credit services organization or a representative of the organization may charge or receive from a consumer valuable consideration before completely performing all services the organization has agreed to perform for the consumer only if the organization has obtained a surety bond for each of its locations or established and maintained a surety account for each of its locations in accordance with Subchapter E." (footnote omitted).  This statute allows an organization to charge prior to completing their services *if,* they have obtained a surety bond.  Obtaining a surety bond is a condition precedent.  No evidence was introduced at the show cause hearing that Select has a surety bond; therefore, Select cannot charge for its services prior to completing those services.

[32] The pamphlet does state that the petition must be prepared by a lawyer.

[33] *See In re Nieves,* 290 B.R. 370 (Bankr. C.D. Cal. 2003) (bankruptcy petition preparer engaged in unauthorized practice of law when he gave debtors advice on the differences between bankruptcy under chapter 7 and chapter 13) (*citing In re Skobinsky,* 167 B.R. 45, 50 (E.D. Pa. 1994); *In re Anderson,* 79 B.R. 482, 485 (Bankr. S.D. Cal. 1987)).

Through the Credit Repair Organizations Act, federal law also governs Select's actions. 15 U.S.C.A. § 1679 (1998 & Supp. 2005). Like the Texas Finance Code, § 1679 similarly prohibits certain practices by credit services organizations.[34] Specifically, § 1679b(b) prohibits a credit repair organization from charging or receiving money before services are rendered.[35] Moreover, § 1679c sets forth, in detail, what is required in the disclosure statement. The required disclosures were not included in the packet Select sent to the Debtor. [Trustee, Ex. 2.] Select had printed a cancellation notice on the back of the worksheet that states the Debtor may cancel the contract within three days of *entering* into the agreement. [Findings of Fact, ¶ 5.] However, § 1679c requires that the cancellation period must be three days from the date *it is signed*. 15 U.S.C.A. § 1679c (1998). Nonetheless, the Debtor did not sign a contract with Select; rather, the agreement was entered into over the phone. [Findings of Fact, ¶ 5.] This practice is also prohibited by § 1679. A written contract is required and must include the terms and conditions of payment as well as a full and detailed description of the services to be performed. 15 U.S.C.A. § 1679d (1996). Select's documentation to the Debtor was lacking in all respects. Therefore, Select's acts violated federal law in addition to Texas law.

## E.   SANCTIONS

An attorney may be sanctioned pursuant to Federal Rule of Civil Procedure 11 and Bankruptcy Rule 9011 as well as for violations of the Disciplinary Rules of Professional Conduct. *See Thomas v. Sec. Svcs., Inc.*, 836 F.2d 866 (5th Cir. 1988), *Resolution Trust Corp. v. Bright*, 6 F.3d 336 (5th Cir. 1993), DLR Appendix A, Rule 1A (Oct. 10, 1996). Sanctions under Rule 11 are mandatory. *Thomas*, 836 F.2d at 876. Additionally, a judge has inherent power to sanction a party appearing before him or her.

---

[34] Section 1679 uses the term "credit repair organization" but the definition is substantially the same. 15 U.S.C.A. § 1679a(3)(A) (1996) defines credit repair organization as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of –
(i) improving any consumer's credit record, credit history, or credit rating; or
(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); . . . ."

[35] 15 U.S.C.A. § 1679b(b) (1996 & Supp. 2005) states, "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is *fully* performed." (emphasis added).

*See, e.g.*, DLR Appendix A, Rule 10 (Oct. 10, 1996), *Chambers v. Nasco*, 501 U.S. 32, 11 S.Ct. 2123 (1991) (a judge has inherent power to sanction an attorney for bad faith conduct). An attorney may also be sanctioned for conduct occurring outside the courtroom. *Chambers*, 501 U.S. at 44. Bankruptcy courts have broad leeway in forming an appropriate sanction for unethical behavior. *Matter of Prudhomme,* 43 F.3d 1000, 1005 (5th Cir. 1995).

### 1.   CRAIG

Craig's conduct and behavior in this matter have been unprofessional in almost every way imaginable. From his meetings with the Debtor to his appearance in this Court, Craig has shown almost no inclination to act according to the standards of ethical behavior. His practicing law in this Court when he knew his probationary status prohibited him from doing so is particularly egregious. For filing defective documents, for failing to file amended documents, for violations of Disciplinary Rules, and for the unauthorized practice of law, Craig is ordered to disgorge all fees paid to him by Bernal and the Debtor ($500.00). Craig is further ordered to pay the sum of $5,000.00 to this Court. Further, Craig must bring these payments to the show cause hearing for Select (discussed below) and he is ordered to appear at this hearing. One check shall be in the amount of $500.00 and be made payable to Martha Lidia Zuniga. The other check shall be in the amount of $5,000.00 and shall be made payable to the Clerk of Court. Both checks shall be cashier's checks.

### 2.   BERNAL AND BLG

Bernal and BLG's conduct and behavior have similarly been irresponsible and shown a lack of prudence and judgment. Bernal misrepresented to this Court that Select is a non-profit organization when, in fact, it is not. Bernal/BLG selected the less favorable Texas exemption rather than the federal exemption, Bernal/BLG has represented to the public that he/it is able to practice law in the Southern District of Texas, and, worse, Bernard/BLG has actually engaged in the unauthorized practice of law in Texas. [See discussions at III.D.1.a and III.D.5 above.] Accordingly, Bernal is ordered to disgorge all fees paid to him by Select and the Debtor ($699.00), as well as

lost income the Debtor incurred related to this proceeding ($136.00)[36], and the expenses the Debtor incurred by traveling to and from this Court for the 2004 examination and show cause hearing ($40.00)[37]. Bernal is also ordered to compensate the Trustee for incurring attorney's fees and expenses of $2,022.94. [Findings of Fact, ¶ 29.] Further, Bernal shall pay this Court the sum of $2,500.00. The check to the Debtor shall be in the amount of $875.00 and shall be payable to Martha Lidia Zuniga. The check for the Trustee's fee and expenses shall be in the amount of $2,022.94 and shall be made payable to Thompson & Knight, LLP. The last check shall be in the amount of $2,500.00 and shall be made payable to the Clerk of Court. All checks shall be cashier's checks.

3.     **SELECT**

Select, and its principal, Joseph A. Gomez, are required to appear in this Court and show cause why they should not be sanctioned for Select's conduct described herein. The hearing will be held on November 14, 2005 at 2:00 p.m., C.S.T., in Courtroom 600, 6th Floor, Bob Casey Federal Building, 515 Rusk Avenue, Houston, Texas.

**IV. CONCLUSION**

This matter highlights three broad issues that are important for consumer credit counseling firms and bankruptcy practiceners to consider: (1) What role, if any, should credit counseling firms have in referring clients to a specific lawyer for filing a bankruptcy petition? (2) Should the debtors' bar be taking an assembly line approach in counseling prospective debtors and, if so, at what point does the attorney in charge need to step in and confer face-to-face with the client, instead of allowing his/her legal assistants to handle communications over the telephone? (3) How much concern should an attorney have for the plight of his/her client?

Ms. Zuniga's experience indicates that: (1) a referral to only one firm is dangerous because the debtor is not provided with a choice of attorneys, one of whom might be more appropriate than another, e.g., be able to communicate with the debtor in

---

[36] The Debtor testified that she earns $8.50 per hour and had to take two days off of work to attend the 2004 examination and the show cause hearing.
[37] This amount should compensate the Debtor for approximate fuel and parking expenses incurred by the Debtor.

the only language the debtor speaks; (2) attempting to provide competent and reasonably swift legal advice on long distance telephone calls is difficult, if not impossible; and (3) by attempting to provide legal services on the phone rather than in face-to-face meetings, the attorney never becomes personally acquainted with the client and therefore never really appreciates the client's fears and concerns.

In the wake of the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, it is vital that the bar and credit counseling services give serious consideration to these issues. Credit counseling agencies will be more prevalent under this new law, and their influence on prospective bankruptcy filers will be stronger than ever; these agencies need to ensure they give their clients several choices of law firms from which to select. Moreover, the debtors' bar will have to pay close attention to the filing of pleadings under the new law. Debtors' attorneys will have to spend as much time as it takes to become well versed in their clients' financial condition and concerns about their bankruptcy case. If they fail to do so, they will assuredly be in harm's way.[38]

Finally, the consumer debtors' bar will need to pay greater attention — certainly more than was done in Ms. Zuniga's case — to the welfare of their clients. If they do not, their clients might turn against them. Even if their clients do not complain because they are too poor, too ignorant or too scared, as is true in Ms. Zuniga's case, the courts may well impose sanctions *sua sponte*. All in all, the debtors' bar will have to balance the business needs of operating a law firm at a profit with the public need for capable, competent and caring legal counsel. This Court cannot specifically define where this balance lies; only each individual law firm can do so. This Court can only conclude that in Ms. Zuniga's case, this balance was definitely not met.

Signed this 22nd day of September, 2005.

Jeff Bohm
United States Bankruptcy Judge

---

[38] Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the debtors' bar will have more duties and may have personal financial exposure for breaching those duties.

cc:    (1)    Randy Williams
Thompson & Knight LLP
333 Clay, Suite 3300
Houston, Texas  77002

(2)    Dion Craig
7322 Southwest Freeway, Suite 460
Houston, Texas  77074

(3)    Hector Duran
Office of the United States Trustee
515 Rusk, Suite 3516
Houston, Texas  77002

(4)    J. Arthur Bernal
7340 E. Firestone Blvd., Suite 218
Downey, CA  90241

(5)    Joseph A. Gomez
Select Financial Solutions
7340 Firestone Blvd, Suite 226
Downey, CA  90241

Select Financial Solutions
c/o Western Corporation Services, Inc.
7465 W. Lake Mead Blvd., Suite 200
Las Vegas, NV  89128

(6)    Amber Vazquez
Vazquez Law Firm
4117 Guadalupe St.
Austin, Texas  78751

(7)    Martha Lidia Zuniga
182 Glaze Brook
Houston, Texas  77060